21



NOV 14 2001

Clerk of Court

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| *IN RE:* | § | CASE NO. 01-10578 |
| | § | Chapter 11 |
| FEDERAL-MOGUL GLOBAL, INC., | § | (Pending in the United States |
| | § | Bankruptcy Court for the |
| DEBTOR | § | District of Delaware) |

-----------------------------------------------------------------

| | | |
|---|---|---|
| VALENTIN RAMIREZ AND EVA | § | |
| RAMIREZ; LUIS GARCIA AND | § | |
| GUADALUPE GARCIA | § | |
|     PLAINTIFFS, | § | |
| | § | |
| VS. | § | C.A. B-01-178 |
| | § | |
| | § | |
| ABLE SUPPLY COMPANY, ET AL. | § | |

## RESPONSE OF GARLOCK INC
## TO PLAINTIFFS' MOTION TO REMAND FOR LACK OF SUBJECT
## MATTER JURISDICTION, FOR MANDATORY ABSTENTION, OR FOR
## DISCRETIONARY ABSTENTION OR EQUITABLE REMAND
## and
## MOTION BY GARLOCK INC. TO ABATE
## PLAINTIFFS' MOTION TO REMAND

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

    Garlock Inc (Removing Defendant) files this Response to the Plaintiffs' pending Motion to Remand and for other relief and Motion for Expedited Consideration ("Motion to Remand") as follows:

# I
## PRELIMINARY STATEMENT ON MOTION TO ABATE
## CONSIDERATION OF PLAINTIFFS' MOTION TO REMAND

**A.     This Response Is Subject To Removing Defendant's Motion to Abate this Motion To Remand and Motion to Transfer Pursuant to 28 U.S.C. § 157(b)(5).**

1.     Removing Defendant as promptly as practical files its Response to Plaintiffs' Motion to Remand and Removing Defendant's Motion to Abate Plaintiffs' Motion to Remand so as to join all issues raised in the Removing Defendant's pending Emergency Motion To Transfer Civil Action Pursuant to 28 U.S.C. § 157(b)(5).

2.     Consideration of the Motion to Remand (being a determination of the "venue" of this case) is not yet ripe or appropriate for consideration by this District Court. Removing Defendant's Transfer Motion is based solely on a statute that reserves to a specific District Court the determination of the venue for any trial of this Removed case.

> "The district court shall order that personal injury, tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or the district court in the district in which the claim arose, *as determined by the district court in which the bankruptcy case is pending*. (Emphasis added)."   28 U.S.C. §157(b)(5).

Removing Defendant does not suggest that the "Home" District Court should not consider remand, abstention, severance, etc. in making the statutorily mandated venue decision, but respectfully suggests that it is not proper for this Honorable District Court to usurp the "Home" District Court's reserved venue jurisdiction. The Fifth Circuit agrees, as noted in *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824 (5th Cir.1993), holding that:

> " [f]rom our review of the relevant materials, the legislative purpose, and the effect of the language used to achieve that purpose, we conclude that 157(b)(5) was intended to confer new power upon the district court in which a bankruptcy is pending to qualify the choice of venue made by the plaintiff.... *Id. at 834.*

Preservation of this rights is particularly important where the suggestion is to remand the Removed Case to State Court (clearly a "venue" determination) which may in fact destroy jurisdiction of the "Home" District to make such 28 U.S.C. § 157(b)(5) determinations. (See, *Browning vs. Navarro,* 743 F.2d 1069, 1083 (5th Cir. 1984).[1]

3.     Removing Defendant respectfully requests this Court abate, without prejudice, the Motion to Remand and transfer this matter to the "Home" District Court for consideration of the Motion in light of the mandatory determinations reserved under 28 U.S.C. § 157(b)(5).

4.     Removing Defendant incorporates herein its Motion to Transfer, and its Reply to the Response of Plaintiffs to Removing Defendant's Motion to

---

[1] As recognized in *Browning v. Navarro*:

> "It is axiomatic that remanding a case to state court terminates the jurisdiction of a federal bankruptcy or district court over that case. *United States v. Rice, 327 U.S. 742, 66 S.Ct. 835, 90 L.Ed. 982 (1946)* (applying 28 U.S.C. 71); *Robertson v. Ball, 534 F.2d 63, 66 n. 5 (5th Cir.1976)* ("[O]nce the federal district court considers the proper factors and decides to remand, the action should go forward in state court without the further delay of appeal, and without regard to whether the federal district court was correct or incorrect."); 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 3739 (1976 & Supp.1983); . . . Even a federal court, persuaded that it has issued an erroneous remand order, cannot vacate the order once entered. *In re La Providencia Development Corp., 406 F.2d 251 (1st Cir.1969)*." 743 F.2d 1069, 1083 (5th Cir. 1984).

Plaintiffs' maneuvers in this case are only to deprive Removing Defendants a hearing before the "Home" District Court on the implementation of § 157(b)(5) and application of the policy considerations surrounding its enactment (*i.e.*, to assure that a reorganization is "centralized," "speedy," and "efficient") by obtaining from this District Court a remand order, right or wrong, so that jurisdiction by the Home District Court is averted. Clearly severance and remand without input from the Home District Court is a decentralizing of the Chapter 11 process of competing claims against the Debtor and the Debtor's ability to deal with these competing claims, determinations of which are expressly reserved to the Home District Court.

RESPONSE OF GARLOCK INC.                                                                PAGE 3

Transfer. This Response is filed subject to Removing Defendant's pending Motion to Transfer and Motion to Abate this Motion To Remand.

## II.
## REMOVING DEFENDANT'S SPECIFIC RESPONSE TO PLAINTIFFS' INTRODUCTION AND FACTUAL BACKGROUND

5.      Removing Defendant denies the description of the general background of this suit as the case was remanded on October 19, 2001, not October 22, 2001, and Removing Defendant denies that only Waters and Kraus suits were removed, that the removal was filed for the purposes of delay or that this Removed Case should be "summarily removed to the state court . . . ." [See, pg. 2, unnumbered ¶ 4 & 4].

6.      By further reply, Removing Defendant points out that the specific Debtor-Defendants listed in the Application and Notice of Removal are:

*Gasket Holding Inc. (sued individually and as successor-in-interest to Flexitallic Gasket Co.); T&N plc F/K/A Turner & Newell Plc; T&N plc Successor In Interest To Keasbey & Mattison; Turner & Newell Industries, Inc. dba United Gasket Corp; Turner Newell, Ltd. D/B/A United Fabricated*

7.      Dismissal or non-suit without prejudice of the above named Debtor-Defendants were filed post-removal, in the former State Court case. As addressed below, neither pre-removal or post-removal dismissals deprive the District Court of jurisdiction over the pending cross-claims by Removing Defendant against the Debtor-Defendant(s) at the time of Removal. Neither a post-Chapter 11, pre-removal non-suits without prejudice or a post-removal non-suit is a dismissal of claims against the Debtor by co-defendants, only dismissal as a party to this Removed Case from whom the claimant seeks no relief at the time of submission. [See, infra, 33.106 Tex. Rem. Code].

## III.
## PRELIMINARY STATEMENT REGARDING
## PLAINTIFFS REQUEST FOR EQUITABLE RELIEF
## (REMAND AND ABSTENTION)

**A.** **Dismissal of the Debtor by Plaintiffs post-removal [or non-suit] does not Deprive This Court of Jurisdiction, Nor Deprive the Bankruptcy Court of Jurisdiction -- The Cross-actions are not "Third Party Complaints" as Suggested by Plaintiffs:**

8.     Plaintiffs assert that their post-removal (post-petition as to the Chapter 11 case) non-suit deprives this Court of jurisdiction, although Plaintiffs admit that at the time of the removal, a party-Defendant was a debtor in a bankruptcy proceeding. Initially it is the status of parties at the time of removal that controls. See, *Texas Beef Group v. Winfrey*, 201 F.3d 680, 686 (5th Cir. 2000). [2]

9.     However, under Texas personal injury law the contribution rights of parties (statutory in nature) provide the answer, referencing in pertinent part, § 33.016(a) & (b) [identify a contribution defendants and define contribution rights] as follows:

"     (a) . . . a counter-defendant or third party defendant . . . from whom any party seeks contribution with respect to any portion of damages for which that party may be liable, *but from whom the claimant seeks no relief at the time of submission.*"
      (b)     "Each liable defendant is entitled to contribution from each person who is not a settling person who is liable to the claimant for a percentage of responsibility *but from whom the claimant seeks no relief at the time of submission.* A party may assert the contribution right against any such person as a contribution defendant in the claimants action." *Id.* [Emphasis added.] See Chapter 33, Tex. Civ. Prac. & Rem. Code.

---

[2] *Freeport-McMoRan, Inc. v. K N Energy, Inc.,* 498 U.S. 426, 428, 111 S.Ct. 858, 859, 112 L.Ed.2d 951 (1991). *See also Celotex Corp.,* 124 F.3d at 626; *In Re Canion,* 196 F.3d 579 (5th Cir. 1999). [*See, infra* arguments and additional authorities].

As fully illustrated and discussed in detail in Removing Defendants Reply regarding the Transfer Motion, this suit involves, at a minimum, direct actions against a Debtor-Defendant (not "third-party actions among non-defendants). [Removing Defendant incorporates its Arguments and Authorities set out in its Reply to the Response of Plaintiffs to the Motion to Transfer specifically regarding the survival of contribution claims against the Debtor-party].

**B.** **The Plaintiffs' Argument of the Lack of Historical Collection on Contribution or Indemnification Claims In Fact Illustrates the Need for Relief Sought by Removing Defendant:**

10. Plaintiffs suggest in their Remand Motion [*See*, pg. 5, last two unnumbered ¶¶] and in the hearsay affidavit of Jeffrey Simon attached to the Motion [*See*, Exhibit "C" - to which Removing Defendant objects as hearsay and non-evidentiary] that historically Garlock did not attempt collection on its contribution and indemnity claims and seeks to imply that Garlock's claims are immaterial or not relevant to the issues before this or the "Home" District Court. A brief history to date of the asbestosis litigation "industry" will explain why historical events are no longer relevant and why Garlock has taken this extraordinary step to protect its 28 U.S.C. § 157(b)(5) rights.

11. In the mid 1970s, federal and state courts experienced the first substantial influx of tort cases seeking recovery for asbestosisrelated occupational disease.[3] After the Fifth Circuit in *Borel v. Fibreboard Paper Products Corp.* [4] affirmed a $68,000 jury verdict based on a theory of strict liability for failure to warn of a dangerous product, asbestos claims grew into the largest area of product

---

[3] *See* DEBORAH R. HENSLER ET AL., ASBESTOS IN THE COURTS: 714S CHALLENGE OF MASS TOXIC TORTS vii (Rand Inst. 1985).

liability litigation in history. Plaintiffs sought recovery from asbestos miners, manufacturers, and suppliers of asbestos products.[5]

12.   By the 1980s, the asbestos-tort related litigation was growing out of control.[6] By 1982, as many as 20,000 claimants had filed lawsuits, and $1 billion had been spent in litigation expenses and compensation.[7] Inordinate delays and excessive transaction costs became common. Similarly situated plaintiffs experienced widely disparate outcomes in the courts. Aggregation of claims within the tort system led to even more irrational outcomes. By the time Johns-Manville Corporation, the nation's leading asbestos manufacturer and the leading target of asbestos lawsuits,[8] filed for bankruptcy protection in 1982, it had become clear that the ordinary civil judicial system could not effectively cope with the wave of new claims.

13.   In 1990, Chief Justice Rehnquist appointed a distinguished *panel* of judges to serve on a Judicial Conference Committee charged with examining the growing asbestos litigation problem. After extensive study, the Committee reported in 1991 that the "situation has reached critical dimensions and is getting worse." Characterizing the state of asbestos litigation as "a disaster of major proportions to

---

[4] 493 F.2d 1076 (5th Cir. 1973), *cert. denied,* 419 U.S. 869 (1974).

[5] *See* JAMES S. KAKALIK ET AL., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES 5 (Rand Inst. 1984).

[6] *See Jenkins,* 782 F.2d at 470 ("Courts, including those in our own circuit have been ill-equipped to handle this *'avalanche of litigation'"); Georgine,* 1.57 F.R.D. at 263 ("By the early to mid1980s, major problems began to appear on the horizon in the asbestos litigation.").

[7] JAMES S. KAKALIK ET AL., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES v (Rand Inst., *1984).*

[8] *See Kane v. JohnsManville Corp.,* 843 F.2d 636, 639 (2d Cir. 1988); Lester Brickman, *The Asbestos Claims Management Act of 1991: A Proposal to the United States Congress,* 13 CARDOZO L. REV. 1891, 1917 n. 13 (1992.) (Before bankruptcy, Manville bore the brunt of asbestos litigation; it had the largest market share of asbestos product sales and was assessed the highest percentage of If ability by the tort system.").

both the victims and the producers of asbestos products," the Committee concluded that the civil courts were "ill-equipped' to address the mass of claims in an effective manner.[9]

14. Since then, the asbestos litigation problem has deteriorated even further.[10] Indeed, the Supreme Court recently observed that both the federal and state judicial systems labor under the weight of an "elephantine mass of asbestos cases" that "defies customary judicial administration." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999). As the Judicial Conference Committee observed, one of the "most objectionable aspects of asbestos litigation" is that "dockets in both federal and state courts continue to grow."[11] Prior to 1980, plaintiffs had filed approximately 950 asbestos cases in the federal District Courts.[12] By 1985, 37,000 cases had been filed, a fourfold increase in the filing rate over the preceding five year period.[13] Since then, the filings have continued to grow. In the last five years, new claims against major asbestos producers have averaged approximately 40,000

---

[9] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991).

[10] *The Fairness in Asbestos Compensation Act of 1999 Legislative Hearing on H.P.* 1283, 1061 Cong. at 15 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School) ("The judiciary has been handling the asbestos litigation for a generation, and its management of the litigation has contributed to what is now called a crisis but may better deserve to be termed a disaster.").

[11] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 1991); *id.* at 7 ("The tide of asbestos personal injury and wrongful death litigation in federal and state courts in the 1970s and 1980s continues to rise unabated and has not begun to crest."). *See also Amchem*, 521 U.S. at 598 (quoting the Judicial Conference Report).

[12] TERENCE DUNGWORTH, PRODUCT LIABILITY AND THE BUSINESS SECTOR: LITIGATION TRENDS IN FEDERAL COURTS 36 (Rand Inst. 1988).

[13] DEBORAH R. HENSLER, ASBESTOS LITIGATION IN THE UNITED STATES: A BRIEF OVERVIEW 3 (Rand Inst. 1991) (computations based on the federal statistical data base). *See also Georgine*, 157 F.R.D. at 263 ("Although by this time state and federal courts were already burdened by many asbestos claims, amazingly 1986 saw the rate of filing of new asbestos suits, quadruple.").

per year.[14] Today, the total number of pending claims is unreported but is in the hundreds of thousands, the vast bulk of which Garlock believes are without merit.

15. As the Judicial Conference Report observed, "[i]t is unrealistic to believe that individual trials can provide relief."[15] This is because "[t]he local trial of an individual asbestos claim takes so long that trying each claim separately would require all the civil trial time for the foreseeable future to the exclusion of all other cases in districts with heavy asbestos dockets."[16] As the Fifth Circuit has observed,"[t]raditional methods of litigation are ill-designed to handle such a volume of cases, for their shear number is inundating the courts." Case-by-case adjudication, the court stated, would "delay decision for years if not decades, burden both claimants and manufacturers with massive litigation costs, leave claimants uncertain about the possibilities of eventual recovery and manufacturers unable to determine their financial exposure," as well as clog the court system generally.[17] Any attempt to resolve the litigation on a case-by-case basis would

---

[14] *See* **The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283,** 106th Cong. at 4 (1999) (statement of Dew Paul Verkuil, Cardozo School of Law) ("[L]awsuits continue to arrive at a rate of over 40,000 per year, and over 200,000 cases are now pending."); *id.* ("The rate of new filings and the growing number of pending cases vividly demonstrate a basic fact  the asbestos litigation problem is not getting better, it is getting worse."),

[15] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 19 (Mar. 1991).

[16] *Id. See also* Peter H. Schwk, **Mass Torts: An Institutional Evolutionist Perspective,** 80 CORNELL L. REV. 941, 958 (1995) ("The number of individual claims currently pending and reasonably anticipated in the future is in some mass tort litigations so large that it is singularly not practical to provide individual trials in the traditional fashion.").

[17] **Gideon v. JohnsManville Sales Corp.,** 761 F.2d 1129, 1146 (5th Cir. 1995). As one court remarked in calculating the time it would take to resolve all of the cases pending before it "[i]f the Court could somehow close thirty cases a month, it would take six and onehalf years to try these cases and there would be pending over 5,000 untouched cases at the present rate of filing." **Cimino v. Raymark Indus.,** 751 F. Supp. 649, 652, 666 (E.D. Tax. 1990) (noting that "plaintiffs are facing a 100% confidence level of being denied access to the courts"), aff in part, vacated in part, 15 1 F.3d 297 (5th Cir. 1998).

RESPONSE OF GARLOCK INC.                                                    PAGE 9

"bankrupt both the state and federal court systems."[18] When cases finally proceed to trial, the tort system often produces "lottery-like "outcomes.[19] The "results of jury verdicts are capricious and uncertain.[20] Differences in the application of statutes of limitation, rulings regarding apportionment of damages, admissibility of evidence, the availability of punitive damages, and other substantive aspects of asbestos litigation have led to similarly situated plaintiffs receiving widely disparate compensation.[21]

16.     Because traditional tort system litigation is not a practical option for resolving claims, a de facto privatized claims resolution system has emerged. Companies simply have no choice but to settle claims on a mass basis.[22] These the

---

[18] JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION 141 (1995) (quoting Spencer Williams, Mass Tort Class Actions: Going, Goinig, Gone?, 98 F.R.D. 323, 324 (1983)).

[19] See In re Joint E. & S, Dists. Asbestos Litig., 129 B.R. at 749 ("The disparities [in asbestos litigation] are enormous.... Trials are much like a lottery with substantially higher verdicts in New York City, East Texas and parts of California than other parts of the country.."); The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R; 1283, 10611 Cong. at 4 (1999) (statement of Dean Paul R. Verkuil, Cardozo School of Law) ("[T] system has come to resemble a lottery: Some plaintiffs, those with good lawyers who appear before favorable juries, hit the jackpot with punitive damages and generous compensatory recoveries, while others settle for meager awards or get nothing at all."); Peter H. Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, 15 HARV. J.L. & PUB.POL'Y 541, 560 (1992) ("Such a strong, persistent pattern of disparate outcomes in similar cases obviously offends our most fundamental notions of fairness. For that reason, this pattern is profoundly demoralizing to many asbestos claimants and their families.").

[20] In re School Asbestos Litig., 789 F.2d 996, 1001 (3d Cir. 1986), cert. denied, 479 U.S. 852 (1986) (noting that there are "uneven, inconsistent and unjust results" in asbestos cases); Georgine, 157 F.R.D. at 262 ("Results of jury verdicts are capricious and uncertain. Sick people and people who died a terrible death from asbestos are being turned away from the courts, while people with minimal injuries who may never suffer severe asbestos disease are being awarded hundreds of thousands of dollars, and even in excess of a million dollars. The asbestos litigation often resembles the casinos 60 miles cast of Philadelphia, more than a courtroom procedure.").

[21] DEBORA14 K HENSLER, ASBESTOS LITIGATION IN THE UNITED STATES; A BRIEF OVERVIEW, 6 (Ran Inst. 1991).

[22] See In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1298 (7th Cir.) (observing that aggregation exposes the defendant to "intense pressure to settle"), cert. denied, 516 U.S. 867 (1995); id. at 1304 ("The number of asbestos cases was so great as to exert a well nigh irresistible pressure to bend the normal rules."); Recent Case, 109 HARV. L. REV. 870 (1996) (courts faced with the delay and docket crowding promised by [mass tort class actions] tend to encourage settlement."); Francis E. McGovern, Rethinking Cooperation Among Judges in Mass Tort Litigation, 44 U.C.L.A. L. REV. 185 1, 1858 (1997)

RESPONSE OF GARLOCK INC.                                                   PAGE 10

mass settlements were not governed by traditional principles of liability, which require proof that the defendant's product actually caused injury and a medically valid disease diagnosis. Facing the threat of widely dispersed litigation and forum shopping in unfavorable courts, defendants inevitably agree to "settlement programs" not based upon actual liability but defense costs. Garlock was involved in this process, and in the early 1990's settled its cases as a nominal defendant for 1/50th to 1/100th the amount of the demands now made on the same type of injury claims. Because Garlock was not a primary target in prior years, and others were, Garlock could "buy its peace" at a minimal amount. Garlock had no incentive to initiate suits for contribution or indemnity. It was simply not practical or economically feasible to spend more on legal fees seeking contribution and indemnification claims than the cost of the settlement. However, times have dramatically changed these "settlement programs" and the settlement demands.

17. In 1993, asbestos plaintiffs' lawyers Ron Motley and Joseph Rice observed that "seventeen (17) former asbestos defendants representing one-half to three-quarters of the original liability share have gone into bankruptcy,"[23] Thus, it was inevitable that numerous new companies faced with asbestos bodily injury

---

("plaintiffs' attorneys rush to their favorite judges and demand draconian procedures to pressure defendants to make block settlements.); Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 Nw, U. L. REV. 469, 521 (1994) ("Often the pressure for block settlements comes from plaintiffs' attorneys who hope to get something for a large mass of questionable cases. Some attorneys ... will take almost any case without regard to its merit, hoping for a global settlement.") (footnote omitted).

[23] "*See Ronald L. Motley & Joseph F, Rice*, The Carlough Settlement Blueprint for a Sane Resolution of the Asbestos Problem, MEALEY'S LMG. REP.: ASBESTOS at 24, 25 (July 2, 1993), quoted in Ann E. Cohen, Mass Tort Litigation After Amchem, 2/25/98 ALIABA 269, at 277; *see also REPORT OF THE NATIONAL BANKRUPTCY REVIEW COMMISSION 315* (Oct. 20,1997) ("The bankruptcy system offers a structured system to manage multiple liabilities and has provided a forum for companies with massive liabilities to attempt to do so. At least 15 asbestos manufacturers, including UNR, Amatex, Johns-Manville, National Gypsum, EaglePicher, Celotex, and Raytech, have reorganized or

claims have been forced to seek refuge under Chapter 11.[24]   The 1993 number
greatly exceeded the 1980's filings, and pales in comparison to today's Chapter 11
filings.

18.    The depletion of resources that would otherwise be available to settle
asbestos claimants has, in turn, prompted the plaintiffs' bar to initiate a new wave of
litigation to meet ever increasing demands.[25]   As a result, "[t]he number of
companies involved in asbestos litigation has ... increased as defendants seek to
spread their losses and plaintiffs search for new and previously untapped sources
of compensation."[26]   As Judge Weinstein observed, "a newer generation of
peripheral defendants are becoming ensnarled in the litigation" as plaintiffs'
attorneys seek "to expand the number of those with assets available to pay for
asbestos injuries."[27] This, despite the fact that "[t]he extent of liability, possible
defenses and value of the claims against these new defendants is unknown."[28]  By
1986, close to 500 corporations had been named as lead defendants in federal

---

liquidated in attempts to address massive numbers of known and unknown asbestos claimants using Chapter 11 of the Bankruptcy Code.").

[24] The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283, 106th Cong. at 4 (1999) (statement of Professor Christopher Edley, Jr., Harvard Law School); The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.A 1283,10, Cong. at 2 (1999) (statement of Dean Paul R, Verkuil, Cardozo School of Law) ("Today, I understand that at least twenty-five companies have been famed into Chapter 11 proceedings as a result of asbestos litigation.").

[25] "REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 199 1) (observing that 'future claimants may lose altogether"); Amchem, 521 U.S. at 637 (Breyer, J., concurring in part and dissenting in part) (quoting the Judicial Conference Report).

[26] Steven L. Schultz, *In re Joint Eastern and Southern District Asbestos Litigation: Bankrupt and Backlogged A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 561 (1992).

[27] *In re Joint A. & S. Dist. Asbestos Litig.*, 129 B.R. at 747.

[28] *See also Susan Warren, Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps*. WALL ST. I., (Apr. 12. 2000), at B I ("You have to look under every &tone. . . . The deeper you dig into the industry, the more you find.") (quoting plaintiff attorney James Early). The Judicial Conference Report warned of such developments when it concluded that "exhaustion of assets threatens and distorts the process" of compensating asbestos claimants. REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 199 1).

RESPONSE OF GARLOCK INC.

asbestos cases.[29]   In those days, Garlock was a minor player, at best.   However, the impact of the exponential growth of named Defendants further complicated the costs-factors because Plaintiffs now had an ability to exercise almost unlimited forum shopping.   As an example, in nine (9) related Garlock Removed Cases from Nueces County, the following chart illustrates the impact of this almost unlimited ability to forum shop for favorable courts:

| Name & CA # | Residence | |
|---|---|---|
| Sallie Kennamer, et al  C-01-477 | Cass Co. Tx. | |
| Billy Arnold  C-01-478 | Coolidge AZ. | |
| Charles Porter  C-01-479 | Escondido CA | |
| Harry Snow  C-01-480 | Fontana CA | |
| John Sterling C-01-481 | Reading PA | |
| James Webb  C-01-482 | Bovill, Idaho | Rep. is  Joan Webb |
| James Jackson, Deceased C-01-483 | Hardin, KY | |
| Charles Armstrong  C-01-484 | Waller Co. Tx. | |
| Richard Burdo  C-01-485 | Toledo, Ohio | |

Seven of the nine are not Texas residents, and only two Plaintiffs are Texas resident, and none are from Nueces County, Texas.   Yet because Nueces County and South Texas are viewed as a favorable plaintiffs forums, a large number of unrelated plaintiffs file in

---

[29] DEBORAH R. HENSLER, ASBESTOS LITIGATION IN THE UNITED STATES: A BRIEF OVERVIEW 5 (1991) (Citing TERENCE DUNGWORTH, PRODUCT LIABILITY AND THE BUSINESS SECTOR: LITIGATION TRENDS IN FEDERAL COURTS 26 (Rand Inst. 1988)).

Nueces County. In this case, the plaintiff is a Texas resident that resides in Harris County, no injury occurred there, no facts or events occurred in Cameron County, and none of the more than 50 defendants are from Cameron County.

19. Most recently, however, with the large number of new bankruptcy filings, increased claims filings and demands have been made against secondary players ,who previously had modest roles and had survived the earlier waves of the litigation. In 1999, the sums demanded by plaintiffs for settlement of claims rose dramatically. Pressure was increased as plaintiffs' attorneys became more aggressive. "[C]ompanies in a vast number of industries ... experienced a significant increase in the volume of asbestos lawsuits."[30] Garlock experienced this spike, and then began to re-evaluate its position not only with respect to the defense of these cases, but with respect to enforcing rights of contribution and indemnity.

20. The inevitable was not long in the making: the new wave of Chapter 11 filings soon followed in 1999 and 2000. Thus, faced with significant increases in settlement demands because the non-bankruptcy settlement pools were diminishing, the large but new target defendants such as Babcock & Wilcox, a boiler manufacturer, were forced to seek protection within the bankruptcy system.[31] Despite the fact that its

---

[30] Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform (Nov, 2 8, 2000): Paul M. Sherer, New Credit Aids Federal Mogul in Asbestos Battle, WALL ST. J., Jan. 4, 2001, at A10 (observing that " [p]laintiffs' attorneys have become more aggressive, targeting companies with even pawing links to asbestos"); Richard B. Shmitt, How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial, WALL ST. J., Mar. 5, 200 1, at A I ("The Internet has been a further engine for growth... Several lawyers use the Web to refer big asbestos injury cases to other lawyers, earning what are, in essence, brokerage fees."); Gregory Zuckerman, Specter of Costly Asbestos Litigation Haunts Companies, WALL ST. J., Dec. 27, 2000, at CI ("Plaintiffs' attorneys have become more aggressive, by targeting all kinds of companies with a passing link to asbestos."); Time to Bring Order to Asbestos Litigation, ENG. NEWSRECORD, Dec. 18, 20M, at 148 ("Like dominoes falling in a row, [companies] are filing for Chapter 11 protection to survive the crushing load of these lawsuits, which in turn pushes these lawsuits further down into the industry.").

[31] Melanie Trottman, Babcock Files for Protection of Chapter 11, WALL ST. J., Feb. 23, 2000, at AI 0; Alan Sayre, Babcock & Wilcox Seeks Bankruptcy, AP ONLINE (Feb. 22, 2000).

connection to asbestos was circumscribed, hundreds of thousands of asbestos claims had been filed against it. As settlement demands increased in late 1999, the company was compelled to seek refuge under Chapter 11.[32]

21.     Pittsburgh Corning followed Babcock in April 2000.[33] Soon thereafter in October, Owens Corning, one of the major producers of asbestos products, sought protection under Chapter 11. Although Owens Corning had undertaken a significant effort in the late 1990's to establish a national system for the resolution of its asbestos claims, the company was still overwhelmed by new claims.[34]  Despite its efforts to manage its liability, "[p]laintiffs attorneys who didn't enter into the national settlement continued to bring suits and demand larger payments."[35] Armstrong World Industries filed for Chapter 11 protection in December of last year,[36] as did engineering firm Burns & Roe.[37] And in January Gl followed suit after paying $1.5 billion to settle more than 500,000 asbestos claims."[38]  The year 2001 has been even more dramatic, with the

_____

[32] *See Babcock & Wilcox Cite Asbestos Settlements in Filing for Bankruptcy*, MEALEY's LITIG. REP.: ASBESTOS, Mar, 3, 2000, at 18.

[33] Jim McKay, 140,000 Asbestos Lawsuits Force Filing, PITTSBURGH POSTGAZETM. Apr. 18, 2000, at Fl ("Pittsburgh Corning Corp. yesterday filed for Chapter 11 protection from creditors, saying bankruptcy is the only way it can reasonably deal with 140,000 lawsuits seeking damages over asbestos insulation,").

[34] Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform, Nov. 28, 2000, at 2 (observing that Owens Corning "underestimated the size of its liability, the number and severity of claims that sought to participate in the program, and, most important, the number of likely opt-outs").

[35] Queena Sook Kim Firms Hit By Asbestos Litigation Take Bankruptcy Route, WALL ST. J., Dec. 2 1, 2000, at B4. *See also Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability*, PR NEWSWIRE (10/5100) (citing "a flurry of recent new filings from plaintiff lawyers not participating in the NSP"); John Seewer, Owens Corning Seeks Bankruptcy, CIUCAGO SUNTIMES 4, Oct 5, 2000, at 4 (citing the "cost of resolving claims, combined with new legal filings" as reason for bankruptcy).

[36] *See Jonathan D. Glater, For Armstrong, Bankruptcy is Lesser of Two Evils*, N.Y. TIMES, Dec. 12, 20M, at C4; Queena Sook Kim, Armstrong Holdings Unit Files Under Chapter 11, WALL ST. J., Dec 7, 2000, at A4;.Armstrong World Industries Seeks Bankruptcy Protection Reorganization: Firm Threatened by Mounting Asbestos Liability Claims Will Develop New Strategy, L.A, TIMES, Dec. 7, 2000, at C3.

[37] Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief, ENG. NEWSRECORD, Dec. 18, 2000, at 22 (citing "spike" in plaintiff demands and new filings).

[38] *See* Queena Sook Kim, Gl Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases, WALL ST. I., Jan. 8, 2001, at B 12 ("Repeating a refrain common among companies with asbestos liability, Gl said that despite settling more than 500,000 claims to the tune of $1.5 billion, that was no ebb in the tide of personal injury claims.

RESPONSE OF GARLOCK INC.                                                    PAGE 15

filings of W.R. Grace, U.S. Mineral Products Company, Federal Mogul, [including the Defendants involved herein Gasket Holdings, Inc. [formerly Flexitallic Gasket Company) T&N PLC (formerly Turner & Newell PLC)].   The 2001 filings in Delaware alone, including all related affiliates of just the named entities above, exceed 300 filings.

22.   The string of companies seeking resolution of their asbestos related liability through Chapter 11, coupled with the increasing pressures placed upon the companies remaining outside the system, have led many observers to predict that there is "no end in sight."[39]   Garlock has been required to totally re-evaluate in the past year its ability to not only defend the 100-fold increase in settlement demands for claimed injuries, but every aspect of the equations which must now include protection of their contribution and indemnity rights, and defense of such claims.

23.   Historical conduct of Garlock regarding these claims is absolutely no indicator of the economic conditions faced now by Garlock.   Everything has changed in respect to asbestos litigation, including the economic need and reality to enforce and collect or protect contribution claims.

24.   The traditional Chapter 11 proceedings to date have focused on the individual defendant-debtor issues and have involved Asbestos Tort Committees made up of representatives of the larger asbestos Plaintiffs' law firms (sitting in their

---

In fact, GI's chief executive officer and general counsel, Richard A. Weinberg, said there was a 'dramatic increase in the number of claims.'"); GI Holdings Implements Strategy to Seek Bankruptcy Protection, 14 ASBESTOS & LEAD ABATEMENT REP., Feb. 1, 2001 ("Almost 70,000 claims were filed against the company last year, nearly double the number filed in 1996.").

[39] See Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform 8, Nov. 11, 2000 ("According to our industry sources, without legislative action many more companies will also be forced to file for bankruptcy within the next two years owing to rising costs per claim,"); Jeff St. Onge, Owens Corning Bankruptcy Shows Scope of Asbestos Issue, DAILY BANKRUPTCY REV., Oct. 9, 2000 ("A flood of asbestos lawsuits since the mid 1960s have produced specialty law firms that are fleshing out new clients and cases at an awesome rate. With an ever increasing tide of lawsuits, growing by 50,000 a year by one estimate, the asbestos issue seems destined to throw several more companies into bankruptcy.")

representative capacity for a named claimant).  What has occurred historically by the asbestos Plaintiffs participating in these Chapter 11 cases is the immediate filing of non-suits (*ex-parte* in state court) or severance of these new-filing defendants from the state court litigation and filing of a proof of claim in the bankruptcy case entitling the Plaintiff-claimant to a jury trial of its claim.  Removing Defendant's removal of these cases to the District Court was premised upon both the economic factors of the asbestos litigation industry recited above, and the emerging need to implement 28 U.S.C. 157(b)(5) to "centralize" this litigation in a single court for a single trial -- a request that must be presented to and heard by the "Home" District Court.  Plaintiffs' unilateral action to non-suit or sever a Debtor (without lifting of the automatic stay) dramatically impacts what is now occurring to the District Court assuming jurisdiction over these § 157(b)(5) cases by "self-help" multiplication of jury trials involving the debtor' and the co-defendants common to most of the Chapter 11 cases.  Because most of these pending Chapter 11 cases (a number of which are pending in Delaware such as *Gasket Holdings*) originated from these multi-defendant state court suits that have a number of common co-defendants, the proliferation of actual or potential jury trials is exponential.  [See, 28 U.S.C. 157(b)(2)(B).  This impact, may be illustrated by way of example using the Chapter 11 filings that have occurred just this year:

- **Debtor #1** (using *W.R. Grace's* Delaware Chapter 11 case filed in 2001 for example) had 300,000 pending cases (with many common co-defendants).  W.R. Grace files its Chapter 11, and the plaintiffs immediately sever or non-suit Grace and file proofs of claims in Grace's bankruptcy case.  The result is 300,000 pending state court cases (less W.R. Grace) and 300,000 new proofs of claims entitling plaintiffs to a

jury trial on each such proof of claim for the same injury; or 600,000 jury trials (two each on the same injury, but now to two different juries).

- **Next Debtor # 2** (using co-Defendant *U.S. Gypsum's* Chapter 11 case filed in 2001 in Delaware) and the same Plaintiffs' repeat the drill, severance and non-suit of National Gypsum.   Now there are 900,000 jury trials (3 each on the same facts and same injury, but to three different juries) arising out of the original 300,000 original lawsuits.

- **Next Debtor # 3** (using as an example *Federal Mogul*, etc, this Debtor-Defendant).   The jury trials demanded by Plaintiffs now are 1,200,000.[40]

25.    The following chart illustrates how 1,200,000 jury trials have now been created out of the original 300,000 pending asbestos suits, all on the exact same common nucleus of operative facts, and solely by the "self-help" proliferation tactics of these asbestos plaintiffs.

| Asbestos Proceeding | | |
|---|---|---|
| State Court Original | 300,000.00 | Including W. R. Grace, Garlock, |
| • W. R. Grace files first | 300,000.00 | W. R. Grace now has 300,000 jury trial proofs of claims |
| •Ntl Gypsum files next | 300,000.00 | Ntl Gypsum now has 300,000 jury trial proofs of claims |
| •Gasket Holdings files next | 300,000.00 | Gasket H. now has 300,000 jury trial proofs of claims |
| **Total Jury Trials** | 1,200,000.00 | |

These numbers are rounded, but the results and impact upon the Federal District Court and litigants are reality.

---

[40] These numbers are not intended to be represented as correct or exactly accurate and it is likely not the case that each of the pending asbestos cases, but this illustration did not even go through the multiple 2001 filings, let alone those filings that have occurred in the past several years prior to 2001.   It does not make economic sense to allow such a proliferation of litigation to continue so that the Plaintiffs are able to totally clog the Federal Bankruptcy Courts' and Federal District Courts' dockets and 28 U.S.C. § 157(b)(5) is the basis by which Congress mandated the avoidance of this effect.

26.    To compound Plaintiffs' state court forum shopping, Plaintiffs' history of hurriedly non-suiting without prejudice (as attempted in many of the recently removed cases) or severance so as to maintain jurisdiction but avoid bankruptcy jurisdiction, was best illustrated by Plaintiffs last act to dismiss with prejudice as to this set of nine (9) debtor-defendants (post-removal) just to avoid the jurisdiction of the District Court sitting in bankruptcy.    The net result of this "self-help" forum shopping cannot be denied merely because 9 out of thousands of cases resulting in thousands of past claims filed in bankruptcy have proliferated the dockets of the District Courts exponentially. And it is the District Courts that have been given the authority and power to re-establish single cases, single trials, and single forums to prevent what is in fact happening:

• W.R. Grace [Delaware case No. 01-01139] will liquidate the 300,000 plaintiff claims against it under 28 U.S.C. § 157(b)(5) and 28 U.S.C. § 1441 which specifically preserves the right to a jury trial.

• U.S Gypsum [Delaware Case No. 01-2094] or U.S. Mineral Products [Delaware case No. 01-2471] will liquidate the 300,000 exact same claims, same operative facts, but only as to U.S. Gypsum under 28 U.S.C. § 157(b)(5) and 28 U.S.C. § 1441 specifically preserving the right to a jury trial.; and

• Gasket Holdings Inc [Delaware case No. 01-10578] will liquidate the 300,000 exact same claims and operative facts, but only as to Gasket Holdings pursuant to 28 U.S.C. § 157(b)(5) and 28 U.S.C. § 1441 specifically preserving the right to a jury trial.; and

• Finally, the State Court will liquidate the same 300,000 suits on the exact same operative facts after the stay is lifted to permit liquidation of the

contribution claims, as to all other Defendants except  W.R. Grace, Gypsum, and Gasket Holdings -- or these claims will be handled (all 300,000) in addition to the 300,000 state court jury trials, in Delaware bankruptcy court.

27.     Remand, or severance and remand, of this case to State Court will have two  inequitable and improper results:

        a.      it will continue the proliferation of jury trials of the exact same injury claim;  and

        b.      take away of Removing Defendants and the "Home" District Court the right to review the above in light of the impact on the "Home" District Court already saddled with these Plaintiffs' proofs of claims requiring jury trial liquidation, and remove from the parties' rights the Congressional intent to allow a single District Court to undo the de-centralization of these suits by implementing 28 U.S.C. § 157(b)(5).   To deprive Removing Defendant of the right to present these arguments and fact, particularly on an expedited basis without cause, is simply not warranted by the facts or the tactical "forum shopping" dismissals of the debtors post-removal. The Plaintiffs' demand for "equitable" remand or discretionary "equitable" abstention does not justify depriving Removing Defendants and the "Home" District Court of statutory rights and duties.

## IV.
## REPLY TO MOVANTS' ARGUMENTS AND AUTHORITIES

**A.      The Removal Properly Names Debtor-Parties --The Debtor is a "Real Party" to this Case:**

28.     Plaintiffs arguments [*See*, Section I, unnumbered paragraphs pgs. 3-12] suggest that the District Court lacks "subject matter jurisdiction" There is no jurisdictional defect in this Removed Case.  Removing Defendant filed the Application and Notice of Removal ("Removal Petition") expressly pursuant to 28 U.S.C. § 1452

under the bankruptcy case proceeding styled *In re Federal-Mogul Global, Inc.* ("Federal Mogul) which is the Bankruptcy Court mandated style that must be used for the administratively consolidated proceedings of approximately 100+ Chapter 11 debtors now consolidated under the *In re Federal Mogul* case style in the District Court of Delaware. Plaintiffs admit in ¶ 1. at page 2 of their Response to Removing Defendant's Transfer Motion (filed at the same time as their original Remand Motion) that at the time of removal a debtor [in this case Defendant Gasket Holdings, Inc.] is ". . . one of the Defendants in the case . . . " and acknowledge that " . . . a defendant in the case filed a petition for reorganization pursuant to chapter 11 . . . ."[41] Not only is this admission inconsistent with Plaintiffs' suggestion that this Court lacks subject matter jurisdiction over the case (or Plaintiffs' suggestion that they do not understand the jurisdiction invoked), but is inconsistent with the suggestion that the exclusive reservation of venue determination provided by 28 U.S.C. § 157(b)(5) does not apply to this Honorable District Court.

29. The District Court clearly has jurisdiction over this Removed Case because at the time of removal, a debtor was a party to the suit and the actions have some "conceivable effect" on the estate. See *Wood v. Wood (In re Wood),* 825 F.2d 90, 93 (5th Cir. 1987).[42] Plaintiffs' own pleadings admit that they were not confused at the

---

[41] Removing Defendant filed the Application and Notice of Removal ("Removal Petition") pursuant to 28 U.S.C. § 1452 under the bankruptcy case proceeding styled *In re Federal-Mogul Global, Inc.* ("Federal Mogul) which is the Bankruptcy Court mandated style that must be used for the administratively consolidated proceedings of approximately 100 Chapter 11 debtors now pending under the *In re Federal Mogul* case style in the District Court of Delaware. However, specifically named in the Removal Petition is the party-Debtor (i.e., *Gasket Holdings, Inc.* Attached to Removing Defendants Reply to Plaintiffs' Response to the Transfer Motion as Tab "4" and incorporated herein by reference is the consolidation order entered in *In Re Federal Mogul* specifying the other Debtor-entities which are administratively consolidated under the heading and docket number of *In re Federal Mogul* (Tab "4" omits unrelated pages dealing with numerous other affiliated debtors not parties to this suit).

[42] Subject matter jurisdiction is expressly conferred on the District Court acting in its bankruptcy jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334, *et. seq.*

time of filing of their Responses to Removing Defendants' Transfer Motion inasmuch as they admitted that a Defendant was a debtor in bankruptcy in this case.    In fact, their post-removal dismissals each list the debtor defendants to be dismissed.

**B.    This Court Does Not Otherwise Lack "Subject Matter" Jurisdiction over this Removed Case:**

30.    The Fifth Circuit Court of Appeal specifically addressed the impact of contribution/subrogation claims and "related to" jurisdiction in the recent opinion *In Re Canion*, 196 F.3d 579 (5th Cir. 1999) dealing with non-debtors' contribution and subrogation rights against the Debtor.   Canion, a creditor of the debtor, brought a suit referred to bankruptcy court by the District Court only against named non-debtors, being ". . . several of Canion's friends, relatives, business associates, and employees . . . alleging that they had conspired to interfere with R&B's efforts to collect on its judgment." *Id*. Unlike this case, in *Canion* all defendants were non-debtors who could, under certain events, have contribution, indemnity or subrogation rights over against the Debtor if Canion was successful in his suit.  Canion was not successful and lost at trial.    After trial,    Canion objected to the Bankruptcy Court's "subject matter jurisdiction." The Fifth Circuit first noted that jurisdiction may never be by consent, and proceeded to determine if the bankruptcy jurisdiction extended to these non-debtor claims *at the time of the referral to bankruptcy court.*

> "There is a flaw in R&B's argument regarding the application of legal subrogation to the instant facts:  Although Texas courts liberally apply the doctrine of legal subrogation    [FN23 -omitted] in instances when one person involuntarily pays the debt for which another person is primarily liable,   [FN24-omitted] legal subrogation--like all equitable remedies--is sometimes denied to litigants who come to court with unclean hands. [FN25-omitted]  To prevail against the defendants, R&B would have to prove that they engaged in intentionally tortious or fraudulent conduct-- exactly the type of conduct that has led Texas courts to deny a remedy lying in equity, including legal subrogation.   *Id*. at 585-86

. . . .

> *Assuming that R&B should successfully collect from the defendants the judgment it holds against Canion, and assuming that the defendants' fraudulent conduct would preclude legal subrogation, the total amounts due on claims against Canion's bankruptcy estate would be decreased.* This decrease would inure to the benefit of all other unsecured creditors, each of whom would then share in the disbursement that would otherwise have been paid to R&B. Id. at 586. [Emphasis added]

. . .

> Courts in other circuits that have faced this question have held that a claim between two non-debtors that will potentially reduce the bankruptcy estate's liabilities produces an effect on the estate sufficient to confer "related to" jurisdiction. [FN28][43] *We note that at the time that the district court referred this proceeding to the bankruptcy court,* [FN29] the sequence of events that would reduce the claims against Canion's bankruptcy estate was not certain to occur; however, *the law is well established in this Circuit, as in others, that, when testing "related to" jurisdiction, an effect is not required to a certainty.* Rather, jurisdiction will attach on a finding of any conceivable effect. [FN30][44] " Id. at 586-87. [Emphasis Added.]

---

[43] FN28.

> *See Owens Illinois, Inc. v. Rapid American Corp (In re Celotex Corp.), 124 F.3d 619, 626 (4th Cir.1997)* (finding "related to" jurisdiction when a creditor's claim against a non-debtor would reduce its claim in bankruptcy); *Kaonohi Ohana, Ltd. v. Sutherland, 873 F.2d 1302, 1306-07 (9th Cir.1989)* (upholding "related to" jurisdiction over third- party action as specific performance remedy in third-party action would reduce damages in breach of contract claim against bankruptcy estate); *National Union Fire Ins. Co. v. Titan Energy, Inc., 837 F.2d 325, 329 (8th Cir.1988)* (holding that a coverage dispute between the debtor's insurance company and a creditor was "related to" the bankruptcy as a finding of coverage would reduce the claims against the estate); *Carr v. Michigan Real Estate Ins. Trust (In re Michigan Real Estate Trust), 87 B.R. 447 (E.D.Mich.1988). Id.* at 587

[44] FN30.

> *See In re Wood, 825 F.2d at 94* ("Although we acknowledge the possibility that this suit may ultimately have no effect on the bankruptcy, we cannot conclude, on the facts before us, that it will have no *conceivable* effect.") (emphasis in original); *Copelin v. Spirco, Inc., 182 F.3d 174 (3d Cir.1999)* ("[T]he key word is 'conceivable.' Certainty, or even likelihood [of effect on the estate being administered in bankruptcy] is not a requirement." (internal quotation marks and citation omitted; alteration in original)); *In re Titan Energy, 837 F.2d at 325, 330 (8th Cir.1988)* ("[E]ven a proceeding which portends a mere contingent to tangential effect on a debtor's estate meets the broad jurisdictional test [for 'related to' jurisdiction]."); 1 Lawrence P. King, COLLIER ON BANKRUPTCY 3.01[4][c] at 3-26 (15th ed. 1998) (" '[A]utomatic' liability of the estate is not the sine qua non for related to jurisdiction; all that is necessary is that there could 'conceivably' be some effect upon the estate as a consequence of the litigation in question.").

31.     Canion illustrates that much more tenuous possibilities, jurisdiction is

invoked.   Removed Defendant's contribution claims are statutorily based.   ***Canion***

further illustrates that the maneuvering of Plaintiffs (*i.e.*, here seeking to drop all claims

against a debtor) is not determinative of the Court's jurisdiction nor the impact on the

estate.

> "We find that ***at the time the district court referred the case to the
> bankruptcy court*** (which is the time its jurisdiction is tested), [See, below,
> footnote 29] the outcome of this proceeding could have affected Canion's
> bankruptcy estate.   We conclude, therefore, that the test for "related to"
> jurisdiction has been met."  ***Id***. at 587.
>
> . . . .
>
>> FN29. ***Federal subject matter jurisdiction is tested when the
>> jurisdiction of the federal court is invoked.***     *See Freeport-
>> McMoRan, Inc. v. K N Energy, Inc., 498 U.S. 426, 111 S.Ct.
>> 858, 112 L.Ed.2d 951 (1991); St. Paul Mercury Indemnity Co.
>> v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845
>> (1938).     **Generally, subsequent changes will not divest
>> jurisdiction.** Id.* This case is unusual in that the jurisdiction of
>> two separate federal courts were invoked, and the basis for
>> subject matter jurisdiction in each court was different--the
>> jurisdiction of the district court was based on diversity under
>> 1332, and the jurisdiction of the bankruptcy court was based on
>> bankruptcy "related to" jurisdiction under 1334(b), 157.   It was
>> appropriate to test the district court's jurisdiction when the claim
>> was brought, and the bankruptcy court's jurisdiction at the time
>> of the reference.   *See Continental National Bank of Miami v.
>> Sanchez (In re Toledo), 170 F.3d 1340, 1346 n. 8 (11th
>> Cir.1999)* ("The presence or absence of jurisdiction must be
>> evaluated based on the state of affairs existing at the time the
>> adversary complaint was filed ... ***not at some later time when,
>> for example, it was ultimately determined here that the Estate
>> had no interest in the [matter].***"); *Miller v. Kemira, Inc. (In re
>> Lemco Gypsum, Inc.), 910 F.2d 784, 788- 89 & n. 20; Cf. Smith
>> v. Commercial Banking Corp. (In re Smith), 866 F.2d 576, 579-
>> 80 (3d Cir.1989).*

*See also **Celotex Corp.**, 124 F.3d at 626 (Before applying the **Pacor** test, we note that if

"related to jurisdiction" actually existed at the time of Rapid's removal of the

Contribution Action to the district Court, Rapid's global settlement with the Celotex

bankruptcy estate and the treatment of Owens' claim under the Confirmed Plan could not divest the district court of that subject matter jurisdiction.); *In re Canion, supra.*[45] The "related to" jurisdiction test in *Canion*, in *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984) has also been adopted by the First, Fourth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuit, with little or no variation, and the Second and Seventh Circuits have adopted a slightly less broad test. *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6, 115 S.Ct. 1493, 1499 n.6, 131 L.Ed.2d 403 (1995).

32.    Jurisdiction is far more obvious in this case. *At the time of removal,* each defendant to this Removed Civil Action had a cross-claim against the Debtor pursuant to the Cameron County Standing Order, (being at a minimum all Plaintiffs' claims and all co-defendants' claims for contribution or indemnification if Plaintiffs non-suited their claims pre-petition against the Debtor) and arise out of the same common nucleus of operative facts as the Plaintiffs' claims against the Debtor:

> (i).    At the time of filing of the removal, each Plaintiff in this Removed Case had a wrongful death and personal injury claim against the Debtor governed by 28 U.S.C. § 157(b)(5) which action is stayed by 11 U.S.C. § 362, [even had the Plaintiffs claim been non-suited without prejudice prior to the removal] and each Plaintiff may file a proof of claim in the Debtor's Chapter 11 case in order to preserve this claim [which will preserve that Plaintiff's right to a jury trial on the proof of claim]. [See, also Response to Plaintiffs' Motion to Sever].

---

[45] As established above, if "related to" jurisdiction existed at the time that the underlying action was commenced, subsequent events cannot divest the federal court of subject matter jurisdiction. *Freeport-McMoRan, Inc. v. K N Energy, Inc.,* 498 U.S. 426, 428, 111 S.Ct. 858, 859, 112 L.Ed.2d 951 (1991).

(ii).    Each non-settling, non-debtor Defendant in this Removed Case has a cross-claim for contribution or indemnification against the Debtor arising out of this Removed Case, which cross-action is stayed by 11 U.S.C. § 362 and wholly dependent *for liquidation* upon a trial and determination of Plaintiffs' wrongful death and personal injury against the Debtor, likewise governed by 28 U.S.C. § 157(b)(5) such that each cross-plaintiff (*i.e.* Garlock) must file a proof of claim in the Debtor's Chapter 11 case and may be entitled to a jury trial of this proof of claim.

(iii).    The debtor, as a co-defendant in this Removed Case, at least with respect to each non-settling co-defendant, has a cross-claim for contribution or indemnification against each other co-defendant arising out of, and again wholly dependent *for liquidation* upon a trial and determination of Plaintiffs' wrongful death and personal injury against the Debtor, likewise governed by 28 U.S.C. § 157(b)(5), which Debtor-owned cross action is also stayed by 11 U.S.C. § 362 and which adjudication must occur in a bankruptcy related or controlled proceeding to protect these rights and assets ("property of the estate").

33.    Even more recent is *In re Jeffers*, 2001 WL 96401 (E.D.La., Feb 02, 2001) where the District Court applied the Canion standard in a case closer to the instant case -- that is where the Debtor was a party to the suit:

> "(*citing*)., *In re Canion, 196 F.3d 579, 586* (5 th Cir.1999) ("Courts in other circuits that have faced this question have held that a claim between two non-debtors that will potentially reduce the bankruptcy estate's liabilities produces an effect on the estate sufficient to confer 'related to' jurisdiction.") (citations omitted). ***However, where a party seeks to recover money from a debtor directly, "related to" jurisdiction is clearly implicated.*** *See, e.g., Insure One Independent Insurance Agency, Inc. v. Koestner, 198 B.R. 709, 711 n. 1 (N.D.Ill.1996)* (" 'Related to' jurisdiction primarily is intended to encompass *tort, contract, and other*

*legal claims by and against the debtor*, claims that, were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that section 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum.") (citing *Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 161* (7th Cir.1994)). *Id*. at *3. [Emphasis added.]

34.     The recent Sixth Circuit opinion in ***In re Dow Corning Corp***., 86 F.3d 482, 486 (6th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 718, 136 L.Ed.2d 636 (1997), (citing the Fifth Circuit jurisdiction test) dealt even closer by addressing the 28 U.S.C. § 157(b)(5) issue in a "related to" non-debtor contribution circumstance:

"The first issue to be resolved is whether the district court has subject matter jurisdiction over breast implant claims pending not only against the debtor, Dow Corning, but also over certain claims pending against the **non-debtor defendants**. *Id*. at 488. [Emphasis added].
. . . .
Although "situations may arise where an extremely tenuous connection to the estate would not satisfy the jurisdictional requirement" of Section 1334(b), *Robinson v. Mich. Consol. Gas Co., Inc., 918 F.2d 579, 584 (6th Cir.1990)*, Congressional intent was "to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards, 514 U.S. 300, ----, 115 S.Ct. 1493, 1499, 131 L.Ed.2d 403 (1995)* (citations omitted).
. . . .
We believe two of these theories support a finding that the district court has "related to" jurisdiction over the claims at issue, and address them in turn.

**1. Claims for Contribution and Indemnification** . . . . Relying on Pacor, the district court rejected this basis for "related to" jurisdiction and held that the possibility of contribution or indemnification should only be regarded as relevant if and when judgments are actually entered against the non-debtors. *Id*. at 490.
. . . .
Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on "the debtor's rights, liabilities, options, or freedom of action" or the "handling and administration of the bankrupt estate."
*In re Marcus Hook Dev. Park Inc., 943 F.2d 261, 264 (3d Cir.1991)* (citation omitted). *Id*. at 491
. . . .

> Based on the principles outlined above, we believe the district court has "related to" subject matter jurisdiction *over the breast implant claims pending against the non-debtor defendants* in this case. *Id.* at 493. [Emphasis added.][46]

The Sixth Circuit reversed so that the "Home" District Court could review and determine the standards of 28 U.S.C. § 157(b)(5) in the context of co-defendant contribution claims.

35.    Notwithstanding the substantial body of case law recognizing claims in bankruptcy for contribution and indemnification, Plaintiffs cite a number of cases not consistent with the facts of this case or the suggestions of their holdings.    In fact Plaintiff peppers its Motion To Remand with a number of cases simply inapplicable or miscanstrued.

36.    In *In re Alejandro Lupercio* __ B.R. ___ (W.D. Tex. ) [Ex. "E" Motion to Remand] correctly found that where no Debtor was a party to the suit and the claim was ". . . not a case under title 11 at all, but  . . . instead a state law breach of contract complaint (between two non-debtors) the case should be remanded the case back to state court.   The Court held that the proceeding was neither "core" nor did it "meet the characterization of a non-core proceeding provided in 28 U.S.C. § 157(b)(5)" -- *i.e.* a personal injury, tort or wrongful death claim liquidation which involved the debtor.   In this case, the debtor is a party with claims against it and liquidation of a personal injury and wrongful death claim are required to establish the amount of the claim and the

---

[46] The Sixth Circuit reversed and remanded back to the district court to consider the "related to" jurisdiction over the non-debtor co-defendant contribution claims.    As noted *infra*, the Sixth Circuit later reversed the District Court's determination not to transfer into the home District Court the non-debtor shareholder suits under §157(b)(5).

contribution claims. Garlock's claim is directly against the Debtor for contribution which may be liquidated only by liquidation of a personal injury, wrongful death claim.

37. Plaintiffs next cite *In re Simeon Johnson vs. ACand S, Inc., et. al* [S.D. Miss, Oct. 3, 2001), a case in which all debtors were dismissed pre-removal, and also pre-removal "the Case Management Order . . . *specifically severed such actions as the instant cross-claims from the asbestos suit* . . . (as to all parties, including the debtor) [*Id*. at pg. 2-3]. The Court found "defendants' cross-claims immaterial and insubstantial cross-claims" because these cross-claims were *"against a non-party currently involved in bankruptcy proceedings . . . ." Id*. pg. 3. [Emphasis added.] This holding is correct, but has nothing to do with the facts of this case. In the instant case, the Debtor was and is a party.

38. Plaintiffs also cite to *Broyles v. U.S. Gypsum Co.,* 266 B.R. 778 (E.D. Tex. 2001) [involving no issue of § 157(b)(5) or no debtor-party]; *Adams v. C.E. Thurston & Sons, Inc*. (E.D. Va. July 16, 2001) [involving no issue of § 157(b)(5) and no debtor-party] [See, Exhibit F to Plaintiffs Motion]; and *Painter v. Certainteed Corp.* (N.D. Tex. Dec. 20, 2000) [involving no issue of § 157(b)(5) and no Debtor party] [See, Exhibit G to Plaintiffs Motion]. Each of these cases deal with contractual settlement disputes brought on breach of contract claims, and all dealt with third party claims against non-debtors only tangentially connected to a bankruptcy case (with no debtor-party involved) and certainly no § 157(b)(5) application. However, notably in each of these various cases cited by Plaintiffs, the Court found that "related to" jurisdiction in fact existed -- *not one case cited by Plaintiffs was a dismissal on subject matter jurisdiction* -- yet this is Plaintiffs' continuing theme throughout the Motion to Remand.

39.    Next, Plaintiffs assert that (prior to it making its motion to dismiss all its claims against the Debtor with prejudice post-removal) that they had no claims against the Debtor because they filed a non-suit post removal.    As noted in *In re Alejandro Lupercio* __ B.R. ___ (W.D. Tex. ) it is jurisdiction at the time of removal that is at issue (*citing Howery v. Allstate Ins. Co.* 2001 WL 203072 *2 (5th Cir. 2001).  And in any event, the co-defendant claims against the Debtor existed on the date of removal and continue directly against the Debtor as a party to this suit.    *See, also, In re Canion, supra.*

## C.    Removing Defendants' Contribution Claims are Not Immaterial or Irrelevant Claims As Suggested By Plaintiffs:

40.    Aside from the fact that Removing Defendant now (as opposed to historically) is compelled to prosecute every possible contribution or indemnity claim, Plaintiffs suggest that the claims themselves are immaterial. The "related to" test does not require any certainty or likelihood that the debtor's rights, liabilities, options or freedom of action will be altered by the outcome of the civil proceeding, nor does it require any certainty or likelihood of impact on the handling and administration of the estate. *In re Celotex Corp.*, 124 F.3d 619, 626 (4th Cir.1997); *see, also, Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6, 115 S.Ct. 1493, 1499 n.6, 131 L.Ed.2d 403 (1995).  "The possibility of such alteration or impact is sufficient to confer jurisdiction." *Id*.    In *Celotex Corp.*, 124 F.3d at 626, the Court found that whether non-debtor co-defendant was held liable in the Contribution Action is a question "related to" the Celotex bankruptcy case because any recovery by one non-debtor co-defendant in that Action would reduce that co-defendant's claim against the bankruptcy estate for contribution by the same amount, thus altering the liabilities of the bankruptcy estate.  Further, any

recovery by that co-defendant against another non-debtor co-defendant would impact the handling and administration of the estate by changing the character of the second co-defendant's indemnification claim against the estate from contingent and unliquidated to certain and liquidated. Id. Therefore, the Contribution Action could conceivably affect the bankruptcy estate and is "related to" the bankruptcy case. Id. at 626-27. [*See, also **In re Canion*** analysis above].

41. Aside from the distinction between *Celotex* and *Pacor* based on the existence of an indemnity agreement between Celotex and one of its non-debtor co-defendants which was not present in *Pacor*, the Fourth Circuit also noted an additional distinction. The Court noted that a non-debtor co-defendant's contribution claim against the Celotex bankruptcy estate served as an additional link between the Contribution Action and the Celotex bankruptcy case, which was not present in *Pacor*. *See also **In re Passodelis***, 234 B.R. 52, 62 (Bankr.W.D.Pa.1999) [The court concludes that "related to" jurisdiction exists given that the outcome of the litigation against Penn Mutual could potentially form the basis of Penn Mutual's indemnification/contribution claim against the instant debtor, thereby impacting the debtor's bankruptcy estate]. *See, also **In re Canion**, supra.* This matter is distinguishable from *Pacor* because the outcome could have a conceivable collateral estoppel effect on the instant debtor in any subsequent indemnification action by Penn Mutual against the debtor given that, unlike the debtor in *Pacor, the instant debtor is a party to the instant plaintiffs'* litigation and because of the potential for the actual litigation of issues which are essential to a judgment against Penn Mutual and involve claims in which the debtor and Penn Mutual are adversaries to each other.).

42.   In the instant matter, when the underlying litigation was commenced , as well as at the time the litigation was removed to the District Court, jurisdiction existed because the Debtors' were parties to the action, the Debtors held cross-claims against the Removing Defendant and the other non-debtor co-defendants for contribution and indemnity, and the non-debtor co-defendants held cross-claims against the Debtors for contribution and indemnity.

43.   Any subsequent severance or settlement between the plaintiffs and the Debtors cannot divest the District Court of its jurisdiction over the contribution and indemnity claims and will but multiply the number of trials on the same operative facts [an outcome avoidable under § 157(b)(5)]. Unlike the situation in *Pacor* and like the situation in *Celotex* and *Passodelis*, the instant Debtors are named as parties to the underlying actions and hold cross-claims against the non-debtor defendants for contribution and indemnity. Further, cross-claims for contribution and indemnity against the Debtors' bankruptcy estate are held by the non-debtor co-defendants, including the Removing Defendant, and litigation of the issues which may lead to the liability of the non-debtor co-defendants are the same issues in which the Debtors and non-debtor co-defendants are adversaries. Litigation of these issues could have a collateral estoppel effect on the Debtors' ability to separately litigate these same issues. Further, the outcome of the litigation could conceivably have an effect on the Debtors' liabilities and freedom of action by limiting the Debtors' ability to pursue its cross-claims for indemnity and contribution against the non-debtor co-defendants, as well as limiting the non-debtor co-defendants' ability to pursue their cross-claims against the Debtors.

44.     Plaintiffs' almost complete reliance on *Pacor* is likewise not a reliable reference of the contribution issues in this case.   As noted in *In re Chateaugay Corp.*, 213 B.R. 633 (S.D.N.Y. Oct 08, 1997)

> "In *Pacor, supra*, the Third Circuit held that an indemnity action against the debtor did not create a "conceivable effect" on the estate because, absent an indemnity agreement among the parties, "there would be no automatic liability against [the debtor] on account of a judgment against Pacor [the debtor's supplier of asbestos]." *Pacor, 743 F.2d at 995. [FN7]*
>          The Third Circuit later retreated from this seeming "automatic liability" requirement.   While not disavowing *Pacor*, the Third Circuit subsequently noted that "[a] key word in [the 'related to'] test is 'conceivable.' " *In re Marcus Hook Development Park, Inc.*, 943 F.2d 261, 264 (3d Cir.1991). *Id.* at 639.
> . . .
> Clearly, the "automatic liability" language in *Pacor* is inconsistent with this Circuit's "any conceivable effects" test." *Id.* at 640.[47]

The reason *Pacor* is relied upon so much by Plaintiffs is that it does not represent the substantial body of law developed since 1984, nor is its holding generally adopted or approved, not even in the Third Circuit.

45.     Plaintiffs, based on *Pacor*, suggest that Removing Defendants' claims for contribution are not recognizable or are so insignificant as to not invoke bankruptcy

---

[47] Certain of *Pacor vs. Higgins (In re Pacor)*, 743 F.2d 984 (3rd Cir. 1984) other holdings are recognized as having been overruled by the Supreme Court and not followed among the Circuit Courts:

> "The right of creditors to receive payments from a debtor as well as the priority among creditors go to the very heart of a bankruptcy proceeding. *In re Best Products Co.*, 68 F.3d 26, 31 (2d Cir.1995).   These fundamental issues were in sharp focus in the case of UCT, Huls, and CoreStates.   A dispute existed between the two creditors as to which was entitled to a $600,000 payment from the debtor.   The terms of the subordination agreement were certainly relevant to its resolution.   Under 28 U.S.C.   157(a), "all proceedings ... related to a case under title 11" are subject to referral to a bankruptcy judge.   The effect of the subordination agreement was clearly "related to" the UCT bankruptcy, that is, it "could conceivably have [an] effect on the estate being administered in bankruptcy." *Celotex Corp. v. Edwards, 514 U.S. 300, 308 n. 6, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995); Pacor Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.1984)*, *overruled on other grounds by, Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995)." *Corestates Bank, N.A. v. Huls America, Inc.*, 1997 WL 560193 (E.D.Pa. Aug 28, 1997).

jurisdiction.    This position is simply wrong.  *See, e.g. In re Dow Chemical, supra.*
Under Texas personal injury law, there is no "common law" contribution; instead, the
contribution scheme is *statutory* in nature.  *See* Chapter 33, Tex. Civ. Prac. & Rem.
Code. As regards statutory contribution, for example, in  *In re Allegheny Intern., Inc.,*
126 B.R. 919 (W.D. Pa. 1991), judgment aff'd, 950 F.2d 721 (3d Cir. 1991) a third-
party's claims against a debtor for recovery of costs under statutory enacted
contribution obligations of joint tortfeasors were expressly recognized.  *See, also,*
*Matter of Harvard Industries, Inc.*, 138 B.R. 10, (Bankr. D. Del. 1992).

46.    Particularly, a claim for reimbursement or contribution that is fixed during a
bankruptcy case is deemed to be a prepetition unsecured and allowed claim.   Likewise,
being unliquidated at one stage of the proceeding does not mean that the claim cannot
be reconsidered for allowance purposes when liquidated.    *See, e.g. In re Wedtech*
*Corp.,* 87 Bankr. 279 (Bankr. S.D.N.Y. 1988).

47.    As further evidence of the impact and importance of contribution and
indemnity claims and the bankruptcy court's handling of those claims, in the more
recently filed Chapter 11 case  (mass tort cases), the bankruptcy court is permitting the
contribution claimants to form their own official committees. [48]

48.    If contribution claims were not of sufficient stature to invoke the
bankruptcy jurisdiction, logic dictates that such claims for contribution or indemnity
would not be subject to the automatic stay -- however, they are subject to the automatic

---

[48] *In re Dow Corning  Corp.,* 194 B.R. 121, 144 (Bankr. E.D. Mich, 1996) *rev'd on other grounds* 212 B.R.
258 (E.D. Mich 1997);  *See,* also *In re Dow Corning,* 183 F.3d 129 (6th Cir. 1996)];  *In re Dow  Corning,*
244 B.R. 721, 746 (Bankr.  E.D. Mich. 1999).

stay generally.[49] Claims for indemnification and contribution ". . . obviously would affect the size of the estate and the length of time the bankruptcy proceedings would be

---

[49] *In re Dow Corning Corp.*, 86 F.3d 482, 486 (6th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 718, 136 L.Ed.2d 636 (1997) involved thousands of product liability claims arising from Dow Corning's manufacture and sale of silicone products. The threatened consequences of these claims prompted Dow Corning to file a petition for reorganization under Chapter 11 of the Bankruptcy Code. Subsequently Dow filed a motion to transfer the claims pending against them to the Eastern District of Michigan. The company envisioned its motion "as the first step in ensuring a feasible plan of reorganization, and indicated that it would seek to have the transferred actions consolidated for a threshold jury trial on certain issues (of liability)." *Id*. at 486.

Citing potential claims for contribution against Dow Corning, the nondebtor manufacturers--Baxter, 3M, Bristol-Myers, and MEC moved to transfer the claims in which they were named as co-defendants with Dow Corning. Chapter 11 debtor-silicone breast implant manufacturer in various jurisdictions by claimants who did not join a global settlement pool to Eastern District of Michigan.

The district court granted Dow Corning's motion to transfer, but denied, on jurisdictional grounds, the motion as it related to the non-debtor manufacturers. In *In re Dow Corning Corp*., 86 F.3d at 482, the Sixth Circuit Court reversed and held that the Eastern District of Michigan had "related to" jurisdiction over breast-implant claims against not only the debtor, Dow Corning, but also other non-debtor defendants contribution claims. The Sixth Circuit Court ". . . further held that 28 U.S.C. § 157(b)(5) granted the district court authority to transfer the cases against the non-debtors (both contribution claimants and shareholders) to the Eastern District of Michigan." *In re Dow Corning*, 113 F.3d 565 (6th Cir. 1997) in dealing with the 28 U.S.C. § 157(b)(5) transfer of the shareholder and contribution claims by way of mandamus to compel the District Court to assume jurisdiction in deciding whether to transfer these cases, the Sixth Circuit noted:

> "*We further acknowledged that the risk to the debtor's estate would be substantially enhanced "if the claims against Dow Chemical and Corning Incorporated are allowed to proceed separately" from those against Dow Corning. Id*. at 495. After outlining the risks to Dow Corning's estate, we remanded to the district court with instructions "to determine in each individual case whether hearing it would promote or impair efficient and fair adjudication of bankruptcy cases." Id. at 497 (quoting *In re Salem Mortgage Co*., 783 F.2d 626, 635 (6th Cir.1986))." [Emphasis added.]

. . . .

> The district court also overlooked the risks to Dow Corning's estate that were clearly articulated in our prior decision. Failing to transfer the claims against the [non-debtors] will likely affect the size of the estate and the length of time the bankruptcy proceedings will be pending, as well as Dow Corning's ability to resolve its liabilities and proceed with reorganization. As we noted in *In re Dow Corning Corp*., 86 F.3d 482, 493 (6th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 718, 136 L.Ed.2d 636 (1997). . . . Therefore, contrary to the district court's determination, the substantial risks identified in our prior decision indicate that the cases against the shareholders should be transferred in the interest of justice. *Id*. at 571.

. . . .

> We further find that discretionary abstention from the cases against the shareholders is wholly inappropriate in this case. In our prior decision, we acknowledged the significant impact that our resolution of these issues will have on the future course of this litigation. We also recognized that perfect satisfaction of all interests was impossible. Armed with that realization, we set out to meet the goal of establishing 'a mechanism for resolving the claims at issue in the most fair and equitable manner possible.' [citation omitted to earlier decision] This goal was to be attained by balancing the following often-competing interests: those of the individuals who have brought and will bring breast implant claims; Dow Corning's interests with regard to its attempt to formulate

pending,[50] as well as (the Debtor's) ability to resolve its liabilities and proceed with reorganization."[51] As a result of co-defendant cross-claims against a debtor-party, no actions by a party, including any attempt by the Plaintiffs at severance or dismissal (by non-suit without prejudice) *of the Debtor after filing of its Chapter 11 case* are effective to remove the debtor as a party-cross-defendant without a specific order and hearing involving the debtor, and is likely stayed. *See, eg.* **In re Baldwin-United Corp.,** 48 B.R. 901, 903 (Bankr. S.D. Ohio, 1985) ["the mere filing of a third-party suit for indemnity and contributions affects the assets of these Debtors, since such suits must

a successful reorganization plan;  Dow Chemical and Corning Incorporated's interests as shareholders of Dow Corning; and the judicial system's interest in allocating its limited resources effectively and efficiently.

The latter three interests clearly will be served by transferring the claims against the shareholders to the Eastern District of Michigan.  The claimant's interests--presumably preserving the assets of Dow Corning's estate and receiving quick adjudication of their claims--will also be accomplished through such a transfer.  Id. at 571.

The reasoning of this case authority is simple and logical -- the claims prosecution and the impact of litigation in multiple foreign courts has a direct impact on the administration of the Chapter 11 case.  Thus, the Sixth Circuit specifically held that the District Court (under 28 U.S.C.  § 157(b)(5)) had the jurisdiction to transfer of all contribution co-defendant manufacturer cases to the "home" district court.  *Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Connecticut (In re Dow Corning Corp.),* 86 F.3d 482, 494 (6th Cir.1996) ("The potential for Dow Corning's being held liable to the non-debtors in claims for contribution and indemnification ... establish[es] a conceivable impact on the estate in bankruptcy.  Claims for indemnification and contribution ... obviously would affect the size of the estate and the length of time the bankruptcy proceedings will be pending, as well as Dow Corning's ability to resolve its liabilities and proceed with reorganization.").  Further, in the *Dow* case the bankruptcy court (as in other mass tort cases) permitted the contribution claimants to form their own official committee.  *In re Dow Corning Corp.,* 194 B.R. 121, 144 (Bankr. E.D. Mich, 1996) *rev'd on other grounds* 212 B.R. 258 (E.D. Mich 1997); *See,* also *In re Dow Corning,* 183 F.3d 129 (6th Cir. 1996)]; *In re Dow Corning,* 244 B.R. 721, 746 (Bankr.  E.D. Mich. 1999).

[50] See also, *A.H. Robins Co. v. Piocc,* 788 F.2d 1994, 1000-10001 (4th Cir.), cert. denied, 479 U.S. 876 (1986) (adverse judgment against party indemnified by Debtor would preclude Debtor from litigating merits of claim); *see also Kossman v. TJX Companies, Inc.,* 136 Bankr. Rptr. 640, 642 (W.D. Pa. 1991) (where debtor indemnification exists, a judgment for the plaintiff would have an effect on the bankruptcy estate, "as some part of the estate would be susceptible to being diverted to meet the indemnity obligation"); *Apex Investment Assocs., Inc. v. TJX Companies, Inc.,* 121 Bankr. Rptr. 522, 526-27 (N.D. Ill. 1990) (because of existence of debtor's indemnification, "[t]he resolution of this case will affect the arrangement of the creditors, and alter the debtor's rights and liabilities with respect to the claims against the estate"); Philippe v. Shape, Inc., 103 Bankr. Rptr. 355, 358 (D. Me. 1989) (where indemnification exists, "a judgment in favor of the plaintiff . . . would automatically result in indemnification liability on the part of [the debtor]"); *In re Brentano's,* 27 Bankr. Rptr. 90, 91 -92 (Bankr. S.D. N.Y. 1983) (a judgment in favor of the plaintiff would automatically result in liability against the indemnitor-debtor).

inevitably add to the administrative costs of the estates with a concomitant decrease in proceeds available for distribution to creditors." *Id.* at 689].[52]   Prosecution of these contribution claims against the Debtor are subject to the automatic stay and, as earlier argued, subject to the mandates of 28 U.S.C. § 157(b)(5) for all "venue" determinations.

## V.
## PLAINTIFFS' REQUEST FOR REMAND OR ABSTENTION IS NOT APPROPRIATE RELIEF FOR THIS DISTRICT COURT

A.   **GARLOCK'S basis for Removal and Transfer: -- Transfer Pursuant to 28 U.S.C. § 157(B)(5) Should Occur before consideration of Plaintiffs' Remand , Abstention, and Severance Motions.**

49.   Under the mandatory language of 28 U.S.C. § 157(b)(5), the "Home" District Court in which the debtor's case was filed (or is pending) has the exclusive jurisdiction to fix the venue of any court action against the debtor, irrespective of the district in which the controversy is pending or was removed.   It is critical that the personal injury claims (singled out for more favorable treatment than all other creditors of a debtor by 28 U.S.C. §§ 157(b)(2)(a), and 1411) be reviewed in light of the 28 U.S.C § 157(b)(5) balancing statute and be handled in a centralized proceeding for the very practical reason that dividing these cases up multiplies the number of Courts, venues, and jury trials involving the exact same common nucleus of operative facts.   This is the express directive of the statute, and the express Congressional intent.   Not to do so

---

[51] See, *In re Dow Corning*, 183 F.3d 129 (6th Cir. 1996).

[52] *Johns-Manville*   837 F.2d 89 (2nd Cir.), *cert. denied*, 488 U.S. 868 (1988) later wrote that contribution claims were ". . . contingent and unliquidated because there has been no determination yet in the state court actions on their possibly liability . . . ." [*Id*. at 688] and had a direct impact on the estate of a debtor, *Johns-Manville* cited the Fifth Circuit as authority to support its holding, quoting *In re All Media Properties, Inc*. 5 B.R. 126 (Bankr. S.D. Tex. 1980*), aff'd* 646 F.2d 193 (5th Cir. 1981):

"'claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrences or happening of an extrinsic event.'" *Id*. at 688.

RESPONSE OF GARLOCK INC.                                                                PAGE 37

deprives the "Home" District Court of the opportunity to balance the harm accomplished by de-centralizing litigation, parties, claims and multiplying jury trials.

**B.      Mandatory Abstention Is Not Applicable to the Plaintiffs' Claims:**

50.     Plaintiffs request mandatory abstention in respect to this personal injury tort case.  The statutes provides otherwise.    28 U.S.C. § 157(b)(2)(B) provides:

> "(2)     Core proceedings include, but are not limited to ---
> (B)     allowance or disallowance of claims against the estate . . .
> but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate . . . ."

28 U.S.C. § 157(b)(4) follows up, with respect to these non-core personal injury claims,

> "Non-core proceedings under section § 157(b)(2)(B) of title 28 United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2)".

51.     Mandatory abstention is not applicable to this Removed Case. Additionally, logic, judicial economy, and the dictates of 28 U.S.C. § 157(b)(5) [implemented by the "Home District Court's obligation to actually make a determination based on the impact upon the bankruptcy case] compel the "Home" District Court consider remand and discretionary abstention in a proceeding which has all parties interests balanced and protected.

**C.      Neither Equitable Remand Nor Discretionary Abstention Are Appropriate Remedies for this Honorable District Court:**

52.     No equitable consideration or equitable maxim would ever dictate the result described in Section III. B. above.  The only balancing effect of what is occurring this asbestos litigation is the "Home" District Court authority under §157(b)(5) (and the respective parties rights to request) that will curb the ultimate melt-down of this litigation system.  Not only is Plaintiffs' requested relief not authorized by law or statute, it is counter-intuitive to every logical mandate of judicial economy, and totally avoidable

by application of 28 U.S.C. § 157(b)(5) and the mandates of the Supreme Court and Congress to "centralize" all issues related to a bankruptcy case in a central proceeding.[53]

**D.      The Elements of Remand Consideration in the Fifth Circuit [Browning vs. Navarro] Do Not Favor Return of this case to State Court - or pre-empting the "Home" Court's venue determinations:**

53.      *Browning v. Navarro*, 743 F.2d 1069, 1076 (5th Cir. 1984) sets the tests and provides that the determination is "fact intensive."   The *Browning* equitable remand factors include the following, which Removing Defendant believes clearly support retention of this case and transfer pursuant to 28 U.S.C. § 157(b)(5):

**a)  A holding that, if the civil action has been bifurcated by removal, the entire action should be tried in the same court.**  This factor is neutral inasmuch as no bifurcated removal occurred.   All parties to this Removed Case were included in the removal.

**b)  A holding that a state court is better able to respond to questions involving state law.**  In particular this weighs in favor of retention of this case.   Federal District Courts have special expertise and special MDL rules and regulations that would

---

[53] "Finally, the manifest purpose of (28 U.S.C.) section 157(b)(5) was 'to centralize the administration of the estate and to eliminate the 'multiplicity of forums for the adjudication of parts of a bankruptcy case.'   *Piccinin*, 788 F.2d at 1011 (*quoting* 130 Cong.Rec. H7492 (June 29, 1984) (remarks of Congressman Kastenmeier), reprinted in 1984 U.S.Code Cong. & Admin.News at 579).   This is consistent with Congress' desire to eliminate the confusion, delay and inefficiencies associated with the Bankruptcy Act's [FN7] limited jurisdictional scheme.   *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 43-52 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6004-13; *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984)."  *In re Pan American Corp*. 950 F.2d 839, 845  (2nd Cir. 1991) [dealing with multiple personal injury claims removed from state court and transferred pursuant to § 157(b)(5)];  *In re U.S. Lines, Inc.*, 216 F.3d 228, (2nd Cir.(N.Y.), 2000);  *Zimmerman v. Continental Airlines, Inc., 712 F.2d 55 (3rd Cir.1983)*, cert. denied, 464 U.S. 1038, 104 S.Ct. 699, 79 L.Ed.2d 165  (1984);  *Matter of National Gypsum Co.*, 118 F.3d 1056 (5th Cir 1997);  *In re Bailey*, 217 B.R. 523, 526 (Bkrtcy.E.D.Tex.1997)  *In re Greyling Realty Corporation*, 74 F.2d 734 (C.C.A.2 (N.Y.), 1935); *In re Singer Co. N.V.*, 2001 WL 984678 (S.D.N.Y., 2001);  *Trefny v. Bear Stearns Securities Corp.*, 243 B.R. 300 (S.D.Tex.,1999);  *In re Greyling Realty Corporation*, 74 F.2d 734 (C.C.A.2 (N.Y.), Jan 07, 1935) *In re Coleman Enterprises, Inc.*, 266 B.R. 423 (Bankr.D.Minn. 2001);  *In re Nu-Kote Holding, Inc.*, 257 B.R. 855 (Bankr.M.D.Tenn. 2000);    *In re Jotan, Inc.*, 232 B.R. 503 (Bankr.M.D.Fla., Apr 12, 1999).

RESPONSE OF GARLOCK INC.                                                            PAGE 39

go much further in preventing the abuses of forum shopping and multiplication of litigation than to remand or abstain in respect to this case. The MDL, for instance, or the proceedings in the "Home" Bankruptcy Courts have been initiated to be totally specialized asbestos proceedings, and no state court compares to these specialized forums.

      **c) Expertise of the particular court:** It is specifically the rule that the District Court (or the District Court exercising its bankruptcy jurisdiction, must consider its own expertise -- especially where state courts may not fully understand bankruptcy law and process. *See, e.g., Sanders v. City of Brady, Texas (Matter of Brady, Texas Mun. Gas Corp.),* 936 F.2d 212 (5th Cir. 1991), *cert. denied,* 112 S.Ct. 657 (1991). Again this factor weighs heavily in favor of retention of this case and transfer to the "Home" District Court, for the reasons stated above. No state court expertise exceeds the specialized forums available (and mandated to be considered and analyzed by the Home District Court) for trial of this case.

      **d) Duplicative and uneconomic effort of judicial resources in two forums:** This factor favors transfer to the "Home" District, at least for a thorough and studied application of the facts of the administration of the estate, were this suit severed into multiple parts. In fact, the purpose of 28 U.S.C. § 157(b)(5) is to mandate this review in a forum having access to the specific needs of the estate, the parties, and the ultimate Court determined to try this case.

      **e) prejudice to the involuntarily removed parties:** No party to this suit is prejudiced by transfer to the "Home" District Court.

**f) comity considerations:**   This consideration could not have any influence favoring remand or abstention. There are no "comity" issues of law or fact which have been determined or that would, upon retention, not be subject to use.

**g) a lessened possibility of an inconsistent result.**   In this case, dividing the matters up among multiple Courts and multiple proceedings invites not only multiple trials and multiple evidentiary hearings on the exact same common nucleus of operative facts, but suggests that there will be substantially inconsistent results.   That possibility, or more accurately stated, that likelihood, should be avoided.   *See, e.g. **In re Branded Products, Inc.,*** 154 B.R. 936, 947 (Bankr. W.D. Tex. 1993).

54.   Examining this case under the ***Browning*** factors leads to only one conclusion --remand to state court is not in the best interests of the parties and such remand would go against the Fifth Circuit's express direction set out in ***Browning***.

**E.    Discretionary Abstention Elements Do Not Favor Pre-empting 28 U.S.C. § 157(b)(5) analysis by the "Home" District Court:**

55.   Discretionary or permissive abstention, in the context of bankruptcy jurisdiction, is governed by 28 U.S.C. § 1334(c)(1). It authorizes the court to abstain from hearing a particular proceeding that falls within its bankruptcy court jurisdiction "in the interests of justice, or the interest of comity with State courts or respect for State law.".   *See, eg., **In re Invader Corp.,*** 71 B.R. 564 (Bankr. W.D. Tex. 1988).

56.   The Supreme Court has criticized the too-facile application of the abstention doctrine.

> "This Court repeatedly has stated that the federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction except in those extraordinary circumstances 'where the order to the parties to repair to the state court would clearly serve an important countervailing interest.'" *See Deakins v. Monaghan*, 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988) *(citing Colorado River Water Conservation District v. U.S.,*

424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 14-15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983))."

The U.S. Supreme Court has directed federal courts to exercise jurisdiction over cases properly removed to the federal courts. *See, Branded Products supra*, at 914.

57.    Abstention by a federal court is considered "an extraordinary and narrow exception to the federal court's duty to adjudicate a controversy properly before it." *In re Chataguay Corp.,* 1990 Bankr. LEXIS 1499 (Bankr. S.D. N.Y. 1990); In re Ascher, 128 B.R. 639 (Bankr. N.D. Ill. 1991) at 646.

58.    Generally, where bankruptcy jurisdiction exists, abstention in the context of bankruptcy jurisdiction requires a finding that a novel issue of state law is involved (See *J.D. Marshall International Inc. v. Redstart, Inc.,* 74 B.R. 651 (N.D. Ill 1987). *Ram Construction Co., Inc. v. Port Authority of Allegheny County,* 49 B.R. 363 (W.D. Pa. 1985) (abstention denied where contract action posed no unsettled questions of state law). *Harley Hotels, Inc. v. Rains International, Ltd.,* 57 B.R. 773 (M.D. Pa. 1985) (abstention refused where no unsettled issues of state law, questions as to interpretation of state constitution or matters of important state policy were involved). However, it is the rule that there is a presumption against abstention when the case involves federal preemption issues  (i.e. such as 28 U.S.C. § 157(b)(5) which restrict trials to "District Courts"), particularly in the bankruptcy context.   State courts are not entitled to any deference, particularly in interpreting federal law. *Coker v. PanAmerican World Airways, Inc. (In re Pan American Corp.),* 950 F.2d 839 (2d Cir. 1991), aff'g, rev'g & remanding, 128 B.R. 59 (S.D.N.Y. 1991).

59.   The factors discussed in *In re Republic Reader's Service, Inc.,* 81 B.R. 422, 429 (Bankr. S.D. Tex. 1987) and cited and adopted in *In re Tucson Estates, Inc.* 912 F.2d 1162, 1166 (9th Cir. 1990) list factors to consider, which substantially overlap the Fifth Circuit's *Browning* factors.   The factors are listed below:

(a)   **The effect or lack thereof on the efficient administration of the estate if a court recommends abstention.**   As mentioned under the *Browning* factor considerations, almost always in this contest of bankruptcy jurisdiction abstention, this Honorable District Court is sitting as an appellate Court.   Only because of 28 U.S.C. 157(b)(5) restricting personal injury matters to the District Court (and particularly to the "Home" District Court, does this District Court now have an element of proof with no evidence.  This Court, not as an appellate Court with a record and a "unit" operating under its supervision, can only speculate on the impact of remand or abstention with respect to this estate -- a circumstances designed not to  occur under implementation of 28 U.S.C. § 157(b)(5) (or in all other circumstances by receiving   findings and recommendations from the bankruptcy court as this Court's unit).   That speculation is not authorized by statute or case law.

(b)   **The extent to which state law issues predominate over bankruptcy issues.**   This issue duplicates the *Browning* factor, and it is the rule that the mere presence of state law claims is not dispositive.  "[T]he mere presence of state law issues is not enough to warrant abstention since 'virtually every issue which arises within the context of a bankruptcy court involves state law to at least some degree.'" *All American Laundry Service v. Ascher* (In Re Ascher) 128 B.R. 639, 647 (Bankr. N.D. Ill. 1991) (citations omitted). *See also, e.g., Neuman v. Goldberg,* 159 B.R. 681, 688 (S.D. N.Y. 1993); *Chicago, Milwaukee, St. Paul and Pacific Railroad Company*

*(In re Chicago, Milwaukee, St. Paul and Pacific Railroad Company)* 654 F.2d 1218, 1221 (7th Cir. 1981) (a bankruptcy court is qualified to decide a suit where no more uncertainty attends [its] disposition than is present in the decision of most legal questions . . . or where the law bearing on the same question in other context is reasonably clear. . . ." ). The "Home" District Court  must also consider its own expertise in addressing bankruptcy issues under the applicable 28 U.S.C. § 157(b)(5).  *See, e.g., Sanders v. City of Brady, Texas (Matter of Brady, Texas Mun. Gas Corp.),* 936 F.2d 212 (5th Cir. 1991), cert. denied, 112 S.Ct. 657 (1991).

**(c)**   **Difficult or unsettled nature of the applicable state law.**

Courts weigh this factor  heavily in determining whether to order remand or allow permissive abstention.   Whether a party can direct the court to any "unsettled or particularly difficult or complex issues of state law which . . . might be better addressed by the state court."  *Ascher*, 128 B.R. 639 at 647.    It is not a factor in the instant Removed Case.

**(d)**   **The jurisdictional basis, if any, other than 28 U.S.C. 1334;  -- i.e. 28 U.S.C. § 157(b)(5) as to the appropriate Court to make this determination.**

Unique to this Removed Case is the application of 28 U.S.C. § 157(b)(5), reserved to only "personal injury, tort, or wrongful death claims."   Remand or abstention, without reversal on appeal,  could destroy the parties' and the "Home" District Court's right to application of this statute.  This factor alone favors retention and transfer.

**(e)**   **The degree of relatedness or remoteness of the proceeding to the main bankruptcy case.**

As the Fifth Circuit noted, it is the jurisdiction at the time of removal that is considered under this test.  At the time of removal the debtor had claims directly against it.  This test is simply a "significant connection" analysis.  *See, e.g.*

*Widewaters Roseland Center Co. v. TJX Companies, Inc.,* 135 B.R. 204 (N.D. N.Y. 1991) [Lessor's suit against non-debtor guarantor of lease was removed from state court and referred to bankruptcy court inasmuch as it had a "significant connection" to the bankruptcy case of lessee.]   There is clearly a significant connection favoring retention of this case.

The next two factors for consideration ("f" and "g") [The substance rather than form of an asserted "core" proceeding.] and [The feasibility of severing state law claims from "core" bankruptcy matters to allow judgments to be entered in sate court with enforcement left to the bankruptcy court.] do not apply to a non-core personal injury claim and are not relevant for consideration.

**(f)**   **The burden on the bankruptcy court's docket.**  This consideration matches the Browning Factor regarding the "Home" Court's special knowledge of administration and is not an item of evidence that Plaintiffs can claim favors remand.   In fact, 28 U.S.C. § 157(b)(5) is designed to specifically obtain a "specialized court's" ruling on this issue.

**(g)**   **The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties.**   Of all elements cited by Plaintiffs, this element could never be viewed as favoring replacing a Plaintiff's case having no connection whatsoever to the forum (and selected only because of the Plaintiff's forum shopping,) back to the State Court.   28 U.S.C. § 157(b)(5) is Congress' statement on "forum shopping" and clearly sets out the method by which this determination is made.   Removing Defendant is not forum shopping, it is enforcing rights given to it to prevent substantial waste, costs, and injustice attendant to the system of asbestos litigation proliferation.

(h)   **The existence of a right to a jury trial -- 28 U.S.C. 1411-preserves this right in the District Court, and it is the "Home" District Court that is to determine where the case should go to trial.**   This issue is relevant only to a case pending in bankruptcy court, in which jury trials are not authorized.   This case, and the considerations of where this case is to go to trial, are set by the statutes' statement of venue: " . . . shall be tried in the district court in which the bankruptcy case is pending, or the district court in the district in which the claim arose . . . ."   28 U.S.C. § 157(b)(5). Jury trials are authorized in both such courts and jury rights of parties are preserved.

(i)   **The presence in the proceeding of non-debtor parties.** Considering all other factors that do not favor retaining this effective "foreign" case even in the State Court in Wichita County, Texas, this factor should not favor remand simply because there are non-debtor parties.

60.   The extraordinary remedy of abstention is not warranted under this case, particularly as a decision that may multiply the litigation and that is made by this Honorable District Court without the application of Congressional policy to the determining factors.

**VI.**
**CONCLUSION**

61.   Garlock's removal of this case to this District Court, consistent with the requirements of removal to the District Court in which the removed case was pending, and its immediate Motion to Transfer, is motivated by deliberate and honorable desire to find a solution other than Plaintiffs' road-map to Garlock's own bankruptcy.   Garlock's bankruptcy would assure that pending and future asbestos claimants that may have legitimate claims and legitimate needs will get nothing for their injury, just as Garlock's

employees and suppliers would lose theie source of income.   Garlock seeks only to preserve this case for the purposes of the review by the "Home" District Court pursuant to 28 U.S.C. § 157(b)(5), preserving thereby the "Home" District Court's decision to remand, abstain, sever, or keep for trial, this case.   Depriving the Removing Defendant of that right in favor of an emergency remand where no emergency has been shown is not justified.

WHEREFORE, PREMISES CONSIDERED, GARLOCK INC prays that Plaintiffs' Motion to Remand be denied or abated, and that this Court exercise jurisdiction in this case for the purposes of 28 U.S.C. § 157(B)(5) and transfer this pending case to the Home District Court, and that Removing Defendant have such other and further relief, at law or in equity to which it may show itself to be justly entitled.

Respectfully submitted,

Mitchell C. Chaney
SB# 04107500
Fed ID #1918
Eduardo Roberto Rodriguez
SB# 17144000
Fed. ID # 1944
Teri L. Danish
SB# 05375320
Fed. ID # 12862
RODRIGUEZ, COLVIN & CHANEY, LLP
1201 East Van Buren
Brownsville, Texas 78522
Phone: (956) 542-7441; fax: (956) 541-2170

ATTORNEY IN CHARGE FOR
GARLOCK INC

_____
Shelby A. Jordan
State Bar No. 11016700
Admissions No. 2195
Harlin C. Womble, Jr.
State Bar No. 21880300
Admissions No. 8959
Nathaniel Peter Holzer
State Bar No. 00793971
Admissions No. 21503
**_Jordan, Hyden, Womble & Culbreth, P.C._**
500 N. Shoreline Dr., Suite 900
Corpus Christi, Texas 78471
Telephone:  (361) 884-5678
Telecopier:  (361) 884-5616

REMOVAL COUNSEL FOR GARLOCK
INC

## CERTIFICATE OF SERVICE

I, Mitchell C. Chaney, hereby certify that a true and correct copy of foregoing document was served by facsimile on November _14th_, 2001 on Charles S. Siegel, counsel for Plaintiffs and by United States Postal Service, postage prepaid, Certified Mail, Return Receipt Requested to Charles S. Siegel, and by First Class Mail, to all counsel of record as listed on the attached service list on the _14th_ day of November, 2001.

_____
Mitchell C. Chaney